IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICK L. GAINES, JESSICA J. KELLY, and ANTHONY TSE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BDO USA, LLP, et al.,<br><br>Defendants. | Case No. 22 C 1878 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Three plaintiffs—Patrick Gaines, Jessica Kelly, and Anthony Tse (collectively, Gaines)—filed suit against BDO USA, LLP, BDO's board, and BDO's retirement plan committee (collectively, BDO), on behalf of a class of individuals who were participants in or beneficiaries of BDO's retirement plan since April 11, 2016. Gaines asserts claims for breach of fiduciary duty (Count 1) and failure to monitor (Count 2).[1] BDO has moved to dismiss both claims. For the reasons stated below, the Court denies BDO's motion, except to the extent Gaines's claims are based on his allegations that BDO selected and retained funds with excessive investment management fees or failed to monitor and control recordkeeping fees.

---

[1] Gaines asserts his claim for breach of fiduciary duty against BDO's retirement plan committee and his claim for failure to monitor against BDO USA, LLP and its board of directors.

## Background

BDO is an accounting firm with over 9,000 employees. Its retirement plan is a defined contribution plan subject to the Employee Retirement Income Security Act of 1974 (ERISA). BDO is the plan administrator and a named fiduciary. As of December 31, 2020, BDO's plan had over 11,289 participants and net assets exceeding $1.24 billion, qualifying it "as a mega plan in the defined contribution plan marketplace." Compl. ¶ 9.

Milliman, Inc. was the plan's recordkeeper until 2018, at which point T. Rowe Price RPS, Inc. became the recordkeeper. Administrative services provided by the plan's recordkeepers are paid for through revenue sharing. Participant disclosure notices state that "[a]n annual 0.04% (or 4 basis points) standard service fee charged to the Plan will be withdrawn quarterly (0.01%, or 1 basis points) from participants' and beneficiaries' accounts." *Id.* ¶ 53. Gaines alleges that "utilizing a revenue sharing approach . . . is extremely costly for [p]lan participants." *Id.* ¶ 62. "[T]he best practice," according to the complaint, is instead "a flat price based on the number of participants in a plan," such that recordkeeping fees do not increase with an increase in plan assets. *Id.* ¶ 65. Gaines alleges that "using revenue sharing to pay for recordkeeping burdened the [p]lan's participants with excessive, above-market recordkeeping and administrative fees." *Id.* ¶ 66.

The plan's annual recordkeeping fees from 2016 through 2020 averaged $85.96 per participant. Gaines alleges that "it was possible for the [p]lan to negotiate recordkeeping fees for not more than between $20 and $35." *Id.* ¶ 70. To illustrate that the plan's recordkeeping expenses were excessive, Gaines compares the plan's

average annual recordkeeping fees per participant with that of nine "comparable plans of similar sizes of assets under management in 2018." *Id.* ¶ 71. Gaines also points to surveys conducted by NEPC, LLC, a consulting group, which reports declining median administrative fees. A 2019 NEPC survey "found that plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees." *Id.* ¶ 74.

In his complaint, Gaines identifies three other "indications of [BDO]'s lack of a prudent process." *Id.* ¶ 107.

First, Gaines alleges that BDO "could not have engaged in a prudent process as it relates to evaluating investment management fees" because the fees were excessive. *Id.* ¶ 95. The complaint compares eight of the plan's mutual fund offerings to "the ICI median for their respective fund categories," displaying in a chart how each fund has an expense ratio over 50% higher than the ICI median. *Id.* The parties do not explain what an ICI median is, but the Court assumes this is a statistic provided by the Investment Company Institute.

Second, Gaines points to BDO's "failure to select the lowest-cost share class available" for certain funds in the plan. *Id.* ¶ 103. Many mutual funds offer multiple classes of shares depending on the size of the investor. The lowest-cost share class, also referred to as the institutional share class, is "sold to institutional investors with more assets and, therefore, greater bargaining power." *Id.* ¶ 97. The most expensive share classes, known as the retail share classes, are sold to individual investors. Gaines alleges that for at least five funds in the plan, BDO selected retail class shares even though the plan "would have easily qualified for lowest-cost share classes" based

3

on its size.  *Id.* ¶ 104.  And, even if the plan would not have qualified, Gaines alleges that "it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan."  *Id.* ¶ 98.  The complaint explains that "[t]here is no difference between share classes other than cost" because "the funds hold identical investments and have the same manager."  *Id.* ¶ 97.  The complaint further states that "[t]he [p]lan did not receive any additional services or benefits based on its selection of more expensive share classes."  *Id.* ¶ 106.

Gaines alleges that "another indication" of BDO's imprudent process is its failure to remove underperforming funds.  *Id.* ¶ 107.  The complaint identifies four funds that "substantially underperformed their respective Morningstar fund categories over the 3- and 5-year periods ended February 28, 2021."  *Id.*  For each alleged underperforming fund, the complaint identifies five funds "in the same fund category and [ ] benchmarked to the same index" that generated greater annual returns at around the same expense or less.  *Id.* ¶¶ 110, 112, 115, 118.

## Discussion

Gaines claims that BDO breached the fiduciary duty of prudence.  Gaines also asserts a failure to monitor claim premised on his duty of prudence claim.  BDO has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

In deciding a motion to dismiss for failure to state a claim, a court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2019).  To survive a motion to dismiss, a plaintiff must allege

"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## A. Breach of fiduciary duty

Under ERISA, plan fiduciaries must "act prudently when managing an employee benefit plan." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 578 (7th Cir. 2022). "The duty of prudence requires a plan fiduciary to discharge its duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . .'" *Id.* at 574 (alterations in original) (quoting 29 U.S.C. § 1104(a)(1)(B)). "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022). Plan fiduciaries breach the duty of prudence if they "fail to remove an imprudent investment from the plan within a reasonable time." *Id.*

To determine whether Gaines has stated a claim for breach of the duty of prudence, the Court evaluates his "allegations as a whole." *Id.* "Courts apply a 'careful, context-sensitive scrutiny of a complaint's allegations' to 'divide the plausible sheep from the meritless goats.'" *Albert*, 47 F.4th at 577 (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). "Because 'the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.'" *Id.* (alterations accepted) (quoting *Hughes*, 142 S. Ct. at 742).

5

Gaines alleges that BDO breached the duty of prudence in four ways: 1) by selecting retail share classes instead of institutional share classes; 2) by failing to remove underperforming funds; 3) by failing to monitor and control recordkeeping fees; and 4) by selecting and retaining funds with excessive management fees. The Court will assess each theory in turn.

1. **Share classes**

Gaines alleges that "it was imprudent for [BDO] to select higher cost retail shares . . ., rather than the lowest-cost institutional class shares" of certain funds. Pls.' Resp. Br. at 11.

The Second, Third, Sixth, Eighth, and Ninth Circuits have all held that allegations that defendants offered "pricier retail shares of mutual funds when those same investment management companies offered less expensive institutional shares of the same funds" state a clam for breach of the duty of prudence. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022); *see also Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 108 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022) ("[W]ith respect to the share-class allegations, we believe that plaintiffs have sufficiently alleged that NYU acted imprudently in offering the number of retail-class shares identified in the complaint."); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 331 (3d Cir. 2019) (holding that allegations "that despite the availability of low-cost institutional class shares, Penn selected and retained identically managed but higher cost retail class shares" supported a duty of prudence claim); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (holding that the "clearest example" of a breach of the duty of prudence was that "[i]nstead of offering [institutional] shares across [the defendant's] entire lineup, . . . it offered retail shares for

6

other funds"); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) ("Defendants . . . failed to monitor and control the offering of a number of mutual funds in the form of 'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments.").

BDO contends that investing in retail share classes does not indicate imprudence because "ERISA does not require fiduciaries to pick one fund over another based on cost alone." Defs.' Opening Mem. at 11 (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)). But in *Hecker*, "the complaint [wa]s silent about the services that Deere participants received," and the Seventh Circuit noted that the plaintiffs may have "received extra investment advice" or "other extra services," such that "their effective cost of participation" in the retail share classes "may in fact have approached wholesale levels." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009) (order denying rehearing). In this case, Gaines has alleged that plan participants receive no additional benefits in the retail share classes and that the only difference between the classes is cost. *See* Compl. ¶ 97 ("There is no difference between share classes other than cost—the funds hold the funds hold identical investments and have the same manager."), ¶ 106 ("The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants."). Taking these allegations as true, as required at the pleading stage, Gaines has sufficiently alleged that BDO acted imprudently by selecting retail share classes instead of institutional share classes. *See Forman*, 40 F.4th at 452 (distinguishing *Hecker* where the plaintiffs similarly alleged "that the retail and

7

institutional shares of these mutual funds were the exact same except for costs").

The Court also notes that part of the Seventh Circuit's reasoning in *Hecker* has been rejected by the Supreme Court. See *Hughes*, 142 S. Ct. at 742. In *Hecker*, the Seventh Circuit rejected the plaintiffs' claim in part because the plans at issue "offered a sufficient mix of investments for their participants." *Hecker*, 556 F.3d at 586. The Supreme Court rejected the Seventh Circuit's categorical rule that "because petitioners' preferred type of investments were available, they could not complain about the flaws in other options." *Hughes*, 142 S. Ct. at 742. The Seventh Circuit has not had occasion to address this particular issue since the decision in *Hughes*. See *Albert*, 47 F.4th at 579–80 & n.6 (observing in the context of excessive recordkeeping fees claims that *Hughes* did not "suggest that the reasoning in *Hecker* . . . no longer stands," but noting that the Sixth Circuit had distinguished *Hecker* in the context of allegations not raised by the plaintiff that "plan fiduciaries should have offered institutional share classes instead of retail share classes of certain investment options"). The Sixth Circuit has observed, however, that *Hughes* "undermines the force of" *Hecker*'s reasoning with respect to these allegations. *Forman*, 40 F.4th at 452 (rejecting the defendant's contention that the plaintiffs' retail share classes claim should be dismissed under *Hecker*).

BDO provides three other arguments for dismissal of the plaintiffs' claims to the extent they are based on this allegation. All of these points are premised on factual assertions that cannot be resolved on a motion to dismiss. First, BDO contends that Gaines "fail[s] to account for the fact that a higher expense ratio may mean more revenue sharing can be used to either defray administrative costs or be re-allocated to participants." Defs.' Opening Mem. at 12. Courts have routinely rejected arguments of

8

this sort at the pleading stage. *See Forman*, 40 F.4th at 450 ("Perhaps the plan has revenue-sharing arrangements in place that make the retail shares less expensive or that benefit plan participants on the whole. But at the pleading stage, it is too early to make these judgment calls."); *Davis*, 960 F.3d at 483 (stating that the defendant's contention that "a plan without retail shares would not have covered the plan's costs because . . . institutional shares do not make large enough revenue-sharing payments" provided "one plausible inference" to explain the defendant's management, but could not carry the day because "every reasonable inference" must be drawn "in favor of the plaintiffs"); *Kong*, 2022 WL 1125667, at *1 ("Though the parties signed a revenue sharing agreement that might provide some explanation for this choice, the agreement shows only what could occur in theory—not what occurred in fact.").

Second, BDO contends that Gaines has not adequately alleged that BDO could have switched to institutional share classes. But Gaines alleges that BDO's plan "ha[s] sufficient assets to qualify for the lowest-cost share class available" and that even if not, "mutual fund companies will typically waive those investment minimums." Compl. ¶ 98. This is an adequate allegation that BDO could have offered institutional share classes. *See Davis*, 960 F.3d at 483 (holding that similar allegations were sufficient to state an imprudence claim).

Lastly, BDO points to two funds that were removed from the plan in 2021, contending that the "the natural inference is that the fiduciaries prudently removed funds when they no longer made sense for the [p]lan." Defs.' Reply Br. at 12. Although this is one reasonable inference, Gaines offers an equally reasonable inference that it was imprudent for BDO to not "just ask for" the "institutional shares of funds that were

already offered by the [p]lan" at the start of the class period, given that the expense ratios "hardly changed since 2016." Pls.' Resp. Br. at 11–12 (quoting *Forman*, 40 F.4th at 450). On a motion to dismiss, the Court must draw all reasonable inferences in Gaines's favor. *See NewSpin*, 910 F.3d at 299; *see also Forman*, 40 F.4th at 450 ("In the absence of further development of the facts, we have no basis for crediting one set of reasonable inferences over the other.") (internal quotation marks omitted).[2]

In sum, Gaines has plausibly alleged a breach of the fiduciary duty of prudence claim based on BDO's selection of more expensive retail share classes instead of institutional share classes for certain funds.

### 2. Underperforming funds

Gaines alleges that "another indication of [BDO]'s lack of a prudent process" was its "failure to remove underperforming funds." Compl. ¶ 107. BDO contends that this allegation does not support a duty of prudence claim because Gaines does not provide a "meaningful benchmark" to compare the performance of the funds. Defs.' Opening Mem. at 14 (quoting *Riley v. Olin Corp.*, No. 4:21-cv-01328-SRC, 2022 WL 2208953 at *4 (E.D. Mo. June 21, 2022)).

"A complaint cannot simply make a bare allegation that costs are too high, or returns are too low. Rather, it must provide a sound basis for comparison—a meaningful benchmark." *Albert*, 47 F.4th at 581 (alterations accepted) (quoting *Davis*,

---

[2] BDO extends this argument in its reply brief to one of the alleged underperforming funds. *See* Defs.' Reply Br. at 13 ("[O]ne of the funds . . . was removed from the line-up before plaintiffs filed suit. This suggests that fiduciaries were engaged in active management of funds, fees, and performance.") (citation omitted). The Court overrules this contention for the same reason—namely, it seeks to draw an inference against Gaines.

10

960 F.3d at 484). "[A] combination of a market index and other shares of the same fund" can meet this standard, "but there is no one-size-fits-all approach." *Davis*, 960 F.3d at 484 (emphasis omitted) (internal quotation marks omitted). In this case, Gaines identifies four funds that "substantially underperformed their respective Morningstar fund categories" and in comparison to other funds in "the same fund category and . . . benchmarked to the same index." Compl. ¶¶ 107, 110. Gaines further alleges that each fund in the same category "share[s] core similarities." Pls.' Resp. Br. at 14. When considered "as a whole" with Gaines's other allegations, *Hughes*, 142 S. Ct. at 742, these allegations are sufficient to support his imprudence claim. *See Brown-Davis v. Walgreen Co.*, No. 19 C 5392, 2020 WL 8921399, at *1–2 (N.D. Ill. Mar. 16, 2020) (holding that the plaintiffs' allegations that certain funds underperformed two indexes, including a Morningstar index, and three comparator funds were sufficient to state a viable duty of prudence claim).

Although BDO contends that certain alleged comparator funds have "obvious flaws," Defs.' Opening Mem. at 14, that is a factual assertion that does not necessitate dismissal of Gaines's claim.[3] *See Brown-Davis*, 2020 WL 8921399, at *2 (denying the

---

[3] BDO also contends in reply that the funds did not "substantially" underperform because certain funds "beat the [Morningstar] benchmark" or were "close to the benchmark" at some points in time. Defs.' Reply Br. at 13. "[A]rguments raised for the first time in a reply brief are waived." *Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 507 n.30 (7th Cir. 2020). And even if the argument were not forfeited, it would not be grounds to dismiss Gaines's claim. Gaines alleges in his complaint that the funds "substantially underperformed" using a variety of metrics. Compl. ¶ 107. "[D]isputes about the proper industry metric with which to evaluate the funds must be saved for subsequent proceedings . . . ." *Sellers v. Trustees of Boston Coll.*, No. CV 22-10912-WGY, 2022 WL 17968685, at *11 (D. Mass. Dec. 27, 2022); *see also Sweda*, 923 F.3d at 331 (holding that allegations "that Penn's process of selecting and managing options must have been flawed if Penn retained expensive underperformers over better performing, cheaper alternatives" were sufficient to support a breach of fiduciary duty

11

defendants' motion to dismiss where "facts [we]re disputed with regard to the similarities between the Funds and Comparator Funds and benchmark indexes"); *Miller v. Astellas US LLC*, No. 20 C 3882, 2021 WL 1387948, at *5 (N.D. Ill. Apr. 13, 2021) ("Aon raises myriad factual disputes regarding the aptness of the comparisons. These are inquiries that are inappropriate to resolve at this stage of the case."); *Kohari v. MetLife Grp., Inc.*, 21 CIV. 6146 (JPC), 2022 WL 3029328, at *7 (S.D.N.Y. Aug. 1, 2022) ("[T]he overwhelming trend with district courts in this Circuit is to defer deciding the question of whether two funds are proper comparators until after discovery.") (internal quotation marks omitted). And, in any event, BDO does not point to any flaws in most of Gaines's alleged comparators or in the Morningstar indexes Gaines uses.

BDO cites *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022), as supplemental authority for its contention that Gaines's allegations in this regard are insufficient. In *Matousek*, the Eighth Circuit reiterated that "there is no one-size-fits-all approach" to providing "a meaningful benchmark" and that it "depends on the totality of the specific allegations." *Id.* at 280–81 (internal quotation marks omitted). The court concluded that "peer groups," where "the composition of the peer groups remains a mystery," and two comparator funds were not meaningful benchmarks. *Id.* at 281–82. In this case, Gaines provides some explanation of the peer group's composition, alleging that they are chosen by Morningstar because the funds "share core similarities." Pls.' Resp. Br. at 14. BDO acknowledges that the fact that the funds are in the same category "mean[s] they all, for example, generally invest in" the same kinds of

---

claim because the "factual allegations must be taken as true, and every reasonable inference from them must be drawn in [the plaintiff's] favor").

companies, such as "small companies" or "emerging companies." Defs.' Opening Mem. at 14. Furthermore, rather than providing two comparator funds as in *Matousek*, Gaines has provided twenty comparator funds—five for each alleged underperforming fund. The totality of Gaines's allegations regarding underperforming funds is thus more detailed than the allegations in *Matousek* and sufficient at the pleading stage to support his duty of prudence claim.

### 3. Investment management fees

Gaines alleges that BDO "employed a flawed fiduciary process by selecting and retaining eight investment options with expense ratios that were more than 50% greater than the ICI median expense ratio for their respective fund categories." Pls.' Resp. Br. at 9. BDO contends that this allegation is "insufficient to infer imprudence." Defs.' Opening Mem. at 9.

The Court agrees with BDO that the ICI median expense ratio, taken by itself, is insufficient to sustain a claim that the funds have excessive investment management fees because it is not a "meaningful benchmark." *Albert*, 47 F.4th at 581 (quoting *Davis*, 960 F.3d at 484). Unlike with the Morningstar categories, Gaines does not provide any explanation of the composition of the peer groups referenced in the ICI median data. *See Matousek*, 51 F.4th at 281–82 (holding that allegations that funds in the plan exceeded the "mean and median expense ratios for their respective peer groups" failed to state a duty of prudence claim where "[t]here [wa]s no way to compare the large universe of funds" in the peer groups to the funds in the plan). Moreover, in contrast to his allegations regarding underperforming funds, Gaines does not identify any comparator funds to provide a "comparison between the fees paid to [the plan's

13

investment advisor] and fees paid to other service providers." *Albert*, 47 F.4th at 582. Indeed, Gaines appears to disclaim a standalone theory of excessive investment management fees in his response brief. Specifically, he emphasizes that the allegation is not "an independent claim," but rather "provides context" and "supports" his other allegations that BDO "employed a flawed process for selecting and reviewing funds resulting in a [p]lan dominated by high-cost funds." Pls.' Resp. Br. at 9–10.

The Court rules that, as currently alleged, Gaines may not sustain a breach of fiduciary duty claim based on BDO's selection and retention of funds with excessive investment management fees. Gaines may use the ICI median data, however, as additional support for his other fiduciary breach allegations.

### 4. Recordkeeping fees

Lastly, Gaines contends that BDO breached the duty of prudence by failing to monitor recordkeeping fees. Gaines alleges that the plan's participants paid on average $85.96 in fees per participant annually, whereas a reasonable fee would not exceed $35 per participant. Gaines primarily relies on nine comparator plans with fees between $18 and $35 per participant and an NEPC survey to support his assessment of a reasonable fee.

The Seventh Circuit "has repeatedly emphasized that the cheapest investment option is not necessarily the one a prudent fiduciary would select." *Albert*, 47 F.4th at 579. Instead, a plaintiff must "allege that the recordkeeping fees were excessive relative to the services rendered." *Id.* at 580 (alterations accepted) (quoting *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022)). Moreover, the "failure to regularly solicit quotes or competitive bids from service providers" does not breach the

duty of prudence.  *Id.* at 579.

Gaines's allegations are quite similar to those the Seventh Circuit found insufficient in *Albert*.  In *Albert*, the plaintiff compared the plan's recordkeeping fees with the fees of nine other plans that had "similar numbers of participants" and "total assets" as the defendant's plan.  *Id.*  The nine comparator plans had an "average annual recordkeeping fee of $32 to $45 per plan participant," whereas the defendant's plan "paid an average annual recordkeeping fee of $87 per participant."  *Id.*  The plaintiff argued that a prudent plan would have paid no more than $40 per participant.  *Id.*  The Seventh Circuit overruled this argument, holding that without comparing the fees to the plan's services, the plaintiff "d[id] not provide 'the kind of context that could move this claim from possibility to plausibility.'"  *Id.* at 580 (quoting *Smith*, 37 F.4th at 1169).

To distinguish *Albert*, Gaines contends that his allegations are more robust because his complaint "points out the pitfalls of unchecked revenue sharing payments (as opposed to flat per participant pricing)."  Pls.' Surreply Br. at 4.  But the Seventh Circuit has previously overruled the argument "that a flat-fee structure is required by ERISA."  *Divane v. Nw. Univ.*, 953 F.3d 980, 989 (7th Cir. 2020) ("[A]lthough total recordkeeping fees must be known to participants, they need not be individually allocated or based on any specific fee structure."), *vacated and remanded on other grounds sub nom. Hughes*, 142 S. Ct. 737.  Although *Divane* was vacated by *Hughes*, the Seventh Circuit later determined that "*Hughes* left untouched" its precedent regarding recordkeeping claims.  *Albert*, 47 F.4th at 580.

Gaines also contends that *Albert* is distinguishable because his complaint "cites numerous legal authorities and industry analyses that recognize that reasonable rates

15

for similar recordkeeping services typically average around $35 per participant."  Pls.' Surreply Br. at 4.  Although Gaines asserts that the services are similar, his complaint does not allege any facts regarding "the quality or type of recordkeeping services" provided by the plans in the industry analyses, such as the NEPC survey, or in legal authorities to which he refers.  *Albert*, 47 F.4th at 579–80; *see also Smith*, 37 F.4th at 1169 ("She has not pleaded that the services that CommonSpirit's fee covers are equivalent to those provided by the plans comprising the average in the industry publication that she cites."); *Matousek*, 51 F.4th at 280 ("NEPC's report says nothing about the fees for the other services that [the plan's recordkeeper] provided, which means it cannot provide a sound basis for comparison for anything else.") (internal quotation marks omitted).

      Gaines cites *Coyer v. Univar Solutions USA Inc.*, No. 22 C 362, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022), for the proposition that a plaintiff does "not need to provide examples of similar plans receiving the *same* services in the *same* year."  Pls.' Surreply Br. at 4.  But in *Coyer*, the plaintiffs alleged that comparator plans offered "virtually the same package of services."  *Id.* at *2.  The court in *Coyer* distinguished *Albert* because the plaintiffs had "provide[d] comparative context" that was missing in *Albert*.  *Id.* at *5.  In this case, Gaines does not provide any factual details regarding the services provided by comparator plans or BDO's plan.  *See Divane*, 953 F.3d at 991 (affirming the dismissal of the plaintiffs' recordkeeping claim where the plaintiffs did not identify an "alternative recordkeeper that would have accepted such a low fee" or "explain how a hypothetical lower-cost recordkeeper would perform at the level necessary to serve the best interests of the plans' participants").  Gaines thus fails

16

to "provide 'the kind of context'" necessary under *Albert*. *Albert*, 47 F.4th at 580 (quoting *Smith*, 37 F.4th at 1169).

The Court therefore rules that as currently alleged, Gaines cannot sustain a duty of prudence claim to the extent it is premised on allegations that BDO failed to monitor and control recordkeeping fees.

**B.     Failure to monitor**

Both parties agree that Gaines's failure to monitor claim is predicated on his duty of prudence claim.[4]  *See id.* at 583 ("[D]uty to monitor claims rise or fall with . . . duty of prudence and duty of loyalty claims.").  Because the Court has concluded that Gaines has stated a viable duty of prudence claim, the Court denies BDO's motion to dismiss his related failure to monitor claim.

## Conclusion

For the reasons stated above, the Court denies defendants' motion to dismiss [dkt. no. 14].  The parties are directed to confer and attempt to agree upon a schedule for further proceedings.  A joint status report in this regard is to be filed on March 28, 2023.  The case is set for a telephonic status hearing on April 5, 2023 at 9:20 a.m.,

---

[4] BDO briefly states in its opening brief that even if Gaines's duty of prudence claim survived, Gaines has "still failed to state a plausible monitoring claim" because he failed to "plead non-conclusory facts about BDO's *specific knowledge* that would have signaled an imprudent act by the Committee." Defs.' Opening Mem. at 15 (citing *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 260 (D. Mass. 2018)). *Velazquez*—the only case BDO cites for this proposition—does not hold that specific knowledge is required, but rather observed that "[c]ourts have been unwilling to delineate and probe the scope of defendants' monitoring duties on motions to dismiss[] and have permitted such claims to proceed forward to discovery." *Id.* (internal quotation marks omitted).  In reply, BDO does not pursue this argument further and instead only contends that Gaines "failed to state a plausible claim that the Committee breached its fiduciary duties, so [his] derivative monitoring claim must also fail." Defs.' Reply Br. at 15.

using call-in number 888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 21, 2023